J-S08010-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| VICTOR NIEVES-CRESPO | : | |
| | : | |
| Appellant | : | No. 980 MDA 2023 |

Appeal from the Judgment of Sentence Entered October 1, 2021
In the Court of Common Pleas of Lackawanna County Criminal Division at
No(s): CP-35-CR-0001337-2020

BEFORE:   OLSON, J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY OLSON, J.:                          **FILED MAY 17, 2024**

Appellant, Victor Nieves-Crespo, appeals from the judgment of sentence entered October 1, 2021, as made final by the denial of his post-sentence motion on June 26, 2023.[1]  We affirm.

The trial court summarized the relevant facts of this case as follows.

> On July 3, 2020, Officer [Stacy] Karabin and Officer Camillocci[2] of the Dickson City Police Department were dispatched by Lackawanna County Communications Center to the Main Street Bistro, located [along] Main Street in Dickson City[, Pennsylvania].  They had received a report of a Hispanic male wearing a tank top shirt and shorts pointing a gun at someone in a driveway.  The 911 dispatcher further reported that the weapon used was a black handgun with a silver side.  While

---

[*] Former Justice specially assigned to the Superior Court.

[1] As will be discussed ***infra***, Appellant's post-sentence and appellate rights were reinstated *nunc pro tunc* on June 13, 2023.

[2] Officer Camillocci's first name is not of record.

enroute, the officers were made aware of the suspect's vehicle, a tan GMC Acadia[,] bearing [a] Pennsylvania Registration [], [and that the suspect] had fled the scene in the direction of the Giant Market and subsequently turned left onto Sunset Drive in Dickson City. The officers ordered the dispatcher to run the vehicle registration, which indicated that the vehicle was registered to Victor Alfonso Neives-Crespo [who resided in] Dickson City, [Pennsylvania].

Police officers from neighboring Blakley Borough assisted in the pursuit and observed the subject vehicle at the intersection of Main Street and Mary Street in Dickson City. The only occupant in the vehicle was the driver, [] Appellant. A traffic stop was initiated and [] Appellant was ordered out of the vehicle. While standing at the driver's side front door, [] Appellant was seen reaching underneath the driver's seat of the vehicle. He was ordered to step away from the vehicle [and subsequently complied. The officers approached Appellant and], while patting him down, [] asked him if he had a firearm on him. [Appellant] stated that he did not have a firearm on his person, [but that] a firearm was under the driver's seat in the vehicle. Appellant was searched and taken into custody, where he was read his **Miranda**[3] rights.

[] Appellant's vehicle was left running with the driver's door open. Blakely Borough Police Officer Michael Shaheen searched [] Appellant's vehicle, locating a black hard plastic box underneath the driver's seat. The box was removed and a firearm matching the 911 dispatcher's description was found inside. The police asked the dispatcher to run the serial number on the firearm, and it was determined that the firearm was last sold to Joline Mary Gish. The officers proceeded to search [Appellant's] vehicle, discovering a clear plastic bag containing a white, powdery substance in the center console of the [] vehicle. The firearm and plastic bag were placed in evidence. Officer [] Karabin weighed the plastic bag and utilized a NIK Drug Test Kit to test the substance which tested positive for [c]ocaine.

Trial Court Opinion, 11/27/23, at 1-3 (footnotes added).

---

[3] **Miranda v. Arizona**, 384 U.S. 436 (1966).

Thereafter, the Commonwealth charged Appellant with possession with the intent to deliver ("PWID"), possession of a firearm prohibited, and firearms not to be carried without a license.[4] On October 2, 2020, Appellant filed an omnibus pre-trial motion seeking to suppress the evidence obtained pursuant to the search of his vehicle, arguing that the officers violated his constitutional rights by stopping his vehicle without constitutional justification. Appellant's Omnibus Pre-Trial Motion, 10/2/20, at *2 (unpaginated). A suppression hearing was held on December 11, 2020. On January 11, 2021, the trial court denied Appellant's motion.

The matter proceeded to a jury trial on April 21, 2021, wherein Appellant was convicted of the aforementioned charges. On October 1, 2021, the trial court sentenced Appellant to an aggregate term of 84 to 160 months' incarceration. Appellant filed an untimely post-sentence motion on October 14, 2021. *See* Pa.R.Crim.P. 720(A)(2)(a)-(c); *see also* Pa.R.A.P. 903(a). Because Appellant failed to secure treatment of his untimely post-sentence motion as a timely post-sentence motion, Appellant's subsequent appeal to this Court was quashed as untimely on April 26, 2022.

On September 26, 2022, Appellant filed a *pro se* petition pursuant to the Post-Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541–9546. In his petition, Appellant claimed that counsel was ineffective for failing to file a timely post-sentence motion. That same day, the court appointed counsel

---

[4] 35 P.S. § 780-113(a)(30), 18 Pa.C.S.A. §§ 6105(a)(1) and 6106, respectively.

and ordered that an amended PCRA petition be filed on Appellant's behalf. Ultimately, however, Appellant retained new counsel, who subsequently filed an amended PCRA petition on April 6, 2023 and a supplemental PCRA petition on May 19, 2023. A hearing on Appellant's petition was held on June 13, 2023. Thereafter, the trial court entered an order granting, in part, and denying, in part, Appellant's PCRA petition. More specifically, the court granted Appellant's request to reinstate his post-sentence and appellate rights *nunc pro tunc* but denied Appellant's additional PCRA claims "as not ripe." Court Order, 6/13/23, at 1. Appellant filed a post-sentence motion on June 22, 2023, which the trial court denied on June 26, 2023. This timely appeal followed.

Appellant raises the following issues on appeal:[5]

1. Whether trial counsel was ineffective for failing to raise ***Commonwealth v. Alexander***[, 243 A.3d 177 (Pa. 2020)] when the case was decided before [Appellant] was convicted and, based upon definitive video evidence and police admissions, would have required suppression of all evidence in this case?

2. Whether [Appellant's] conviction must be vacated and this case remanded for a new suppression hearing because the trial court failed to draft any findings of fact or conclusions of law as required and Superior Court case[] law provides that appropriate credibility determinations cannot be made years after the hearing took place?

3. Whether the traffic stop of [Appellant's] vehicle was unconstitutional and therefore, this Honorable Court should

_____

[5] We have reordered Appellant's claim for ease of discussion and disposition.

reverse the decision of the trial court denying suppression of all evidence?

4. Whether the evidence was sufficient to find [Appellant] guilty of the possession of firearm prohibited charge when the Commonwealth did not present sufficient evidence to prove [that Appellant] was the perpetrator of the prior crime?

5. Whether [Appellant's] convictions under Section 6105 and 6106 of the Crimes Code must be vacated because the statutes as applied to [Appellant] violate his rights under the Second Amendment and Pennsylvania Constitution?

Appellant's Brief at 7-8 (unnecessary capitalization omitted).

In his first issue, Appellant raises a claim of ineffective assistance. More specifically, Appellant argues that trial counsel was ineffective for failing to file a motion to suppress based upon *Alexander*, *supra*, which held that, under Article I, Section 8 of the Pennsylvania Constitution, "a showing of [both] probable cause and exigent circumstances [is required] to justify a warrantless search of an automobile," thereby overruling *Commonwealth v. Gary*, 91 A.3d 102, 138 (Pa. 2014). *Alexander*, 243 A.3d at 181.

In *Commonwealth v. Grant*, our Supreme Court held that, "as a general rule, a petitioner should wait to raise claims of ineffective assistance of trial counsel until collateral review." *Commonwealth v. Grant*, 813 A.2d 726, 738 (Pa. 2002). In *Commonwealth v. Holmes*, our Supreme Court held that "*Grant*'s general rule of deferral to PCRA review remains the pertinent law on the appropriate timing for review of claims of ineffective assistance of counsel." *Commonwealth v. Holmes*, 79 A.3d 562, 563 (Pa.

- 5 -

2013). However, the **Holmes** Court recognized two exceptions to **Grant**'s

general rule of deferral:

> First, . . . there may be extraordinary circumstances where a discrete claim (or claims) of trial counsel ineffectiveness is apparent from the record and meritorious to the extent that immediate consideration best serves the interests of justice; and we hold that trial courts retain their discretion to entertain such claims.
>
> Second, . . . where the defendant seeks to litigate multiple or prolix claims of counsel ineffectiveness, including non-record-based claims, on post-verdict motions and direct appeal, we repose discretion in the trial courts to entertain such claims, but only if (1) there is good cause shown, and (2) the unitary review so indulged is preceded by the defendant's knowing and express waiver of his entitlement to seek PCRA review from his conviction and sentence, including an express recognition that the waiver subjects further collateral review to the time and serial petition restrictions of the PCRA.

**Id.** at 563-564 (citations and footnotes omitted). Thereafter, in

**Commonwealth v. Delgros**, the Supreme Court recognized a third exception

to **Grant**'s general deferral rule. **See Commonwealth v. Delgros**, 183 A.3d

352 (Pa. 2018). The **Delgros** Court held that trial courts must "address claims

challenging trial counsel's performance where the defendant is statutorily

precluded from obtaining subsequent PCRA review." **Id.** at 361.

Herein, Appellant did not waive his entitlement to seek future PCRA

review and he is not "statutorily precluded from obtaining subsequent review."

**Id**. Therefore, Appellant's sole avenue for seeking review of his

ineffectiveness claim is based upon **Holmes**'s first exception, which involves

extraordinary cases with meritorious claims apparent from the record. Upon review, we conclude that Appellant is not entitled to relief.

The vehicle stop and search in this instance occurred on July 3, 2020. Trial counsel filed a motion seeking to suppress the evidence against Appellant on October 2, 2020, alleging that the traffic stop of his vehicle was unconstitutional because it was based solely upon an anonymous tip.[6] The trial court convened a hearing on Appellant's motion on December 11, 2020. Our Supreme Court did not issue *Alexander*, *supra*, until December 22, 2020. Thus, at the time of Appellant's vehicle stop, the filing of his suppression motion, and the suppression hearing, a warrantless search of an automobile based solely on probable cause was considered constitutionally permissible under *Gary*, *supra*. Appellant's claim, therefore, is rooted in his belief that trial counsel rendered ineffective assistance by failing either to anticipate the ruling in *Alexander* or to supplement his suppression filing in the intervening period between the publication of *Alexander* and the issuance of the order denying suppression. Pennsylvania law is clear that criminal defense counsel is not ordinarily deemed ineffective for failing to anticipate

_____

[6] The issue of whether exigent circumstances, in addition to probable cause, existed at the time of Appellant's traffic stop was not raised in Appellant's omnibus pre-trial motion. *See Commonwealth v. Heidelberg*, 267 A.3d 492, 503 (Pa. Super. 2021) (*en banc*) (holding that an appellant must "preserve a challenge to the application of the automobile exception" pursuant to *Alexander* "at 'all stages of adjudication up to and including the direct appeal'" for *Alexander* to have retroactive effect) (citation omitted). To the contrary, Appellant's claim for relief based upon *Alexander* was first raised in his post-sentence motion filed June 22, 2023 and only as the basis for his ineffective assistance of counsel claim.

changes in the law. *See Commonwealth v. Parker*, 249 A.3d 590, 596 (Pa. Super. 2021) (explaining that "counsel cannot be deemed ineffective for failing to anticipate a change in the law" and that this Court has "held repeatedly that counsel's stewardship must be judged in light of the available alternatives and that he cannot be expected to raise motions unsupported by existing law") (citation omitted). Moreover, we are unwilling to say, under the present circumstances, that counsel's failure to supplement his suppression motion constituted an obvious and discrete ineffectiveness claim that demands immediate appellate consideration in the interest of justice. *See Commonwealth v. Alford*, 2021 WL 2907814 *1, *3-*4 (Pa. Super. 2021) (non-precedential decision) (holding that the appellant's claim that trial counsel was "ineffective for failing to raise the constitutionality of the body search in [his] omnibus pre-trial motion" was not "so blatant and 'so shocking to the judicial conscience'" to permit review during the appellant's direct appeal). As such, pursuant to *Grant*, Appellant's ineffective assistance claim must await post-conviction review.

In his second and third issues, Appellant raises claims regarding the disposition of his motion to suppress. In his second issue, Appellant challenges the trial court's failure to issue an order or opinion detailing its "findings of fact or conclusions of law" after the suppression hearing. Appellant's Brief at 31. Appellant argues that, in so doing, the trial court violated Pa.R.Crim.P. 581(I) and requests this Court to "overturn his convictions and remand this case for a new suppression hearing." *Id.* at 34.

In his third issue, Appellant asserts that the trial court otherwise erred in denying his suppression motion. *Id.* at 35. We will address each of Appellant's claims in turn.

We will first address Appellant's claim of error regarding the trial court's failure to enter its findings of fact and conclusions of law after the suppression hearing. Rule 581 of the Pennsylvania Rules of Criminal Procedure, in relevant part, states:

> (I) At the conclusion of the [suppression] hearing, the judge shall enter on the record a statement of findings of fact and conclusions of law as to whether the evidence was obtained in violation of the defendant's rights, or in violation of these rules or any statute, and shall make an order granting or denying the relief sought.

Pa.R.Crim.P. 581(I). It is well-settled, however, that this Court "may look at the trial court's Rule 1925(a) opinion to garner findings of fact and conclusions of law" if "a trial court fails to abide by Rule 581(I)." *Commonwealth v. Stevenson*, 832 A.2d 1123, 1126 (Pa. Super. 2003), *citing Commonwealth v. Reppert*, 814 A.2d 1196, 1200 (Pa. Super. 2002) (relying on the trial court's opinion "filed in accordance with Pennsylvania Rule of Appellate Procedure 1925(a)" to address the appellant's claims regarding the trial court's suppression ruling); *see also Commonwealth v. Parker*, 161 A.3d 357, 360 n.5 (Pa. Super. 2017) ("When the trial court does not enter findings of fact and conclusions of law during suppression proceedings, this Court may garner the trial court's findings of fact and conclusions of law from its Pa.R.A.P. 1925(a) opinion.") (citations omitted).

In this instance, Appellant is correct to point out that the trial court failed to abide by Pa.R.Crim.P. 581(I). Nonetheless, the Rule 1925(a) opinion issued by the trial court "adequately relates the court's findings of fact and conclusions of law." **Stevenson**, 832 A.2d at 1126. Thus, no relief is due.

We now turn to Appellant's challenge to the trial court's order denying his suppression motion. In its 1925(a) opinion, the trial court held that Appellant's initial seizure was constitutional because Officers Karabin and Camillocci possessed reasonable suspicion to stop Appellant. In support of this conclusion, the trial court stated:

> Officer Karabin and Officer Camillocci received notice from a 911 dispatcher that a witness saw a Hispanic male arguing with another Hispanic male. The 911 caller stated that the 'initial male' pointed and racked a pistol and was in a 'GMC [Acadia].' The witness was identified as Luke A. Mushensky[,] Jr., and he provided a written statement. Officers were advised that the vehicle bore [a particular] Pennsylvania [r]egistration [] and was leaving the scene.
>
> The vehicle was registered to [Appellant]. Officers were informed that [] Appellant fled the scene [in] the GM[C] Acadia, that the gun used was a black gun with a silver slide, and that the vehicle was fleeing toward the Giant supermarket in Dickson City[, Pennsylvania]. Blakley police located the vehicle in Dickson City and conducted a traffic stop. All the above information taken together gave officers the reasonable suspicion that criminality was afoot. The information received was specific to [] Appellant's description, the vehicle he was driving, and the direction he was traveling. Furthermore, the information was corroborated by the police officers within minutes. Accordingly, . . . the investigatory traffic stop was valid and lawful.

Trial Court Opinion, 11/27/23, at 9.

On appeal, Appellant argues that the trial court's "limited factual findings . . . are not supported by the record." Appellant's Brief at 37. Initially, Appellant points out that Officer Anthony Mercado, the officer who testified during the suppression hearing, "initiated the traffic stop and/or seizure of [Appellant]." *Id.* at 36. Then, Appellant disputes the trial court's finding that "Luke Mushensky [Jr.] was the witness and provided a written statement prior to [Appellant's arrest]." *Id.* at 37. Instead, Appellant claims that the testimony at the suppression hearing indicated that Officer Mercado "had no idea where the information relayed by [the 911 dispatch] came from." *Id.* Hence, Appellant contends that Officer Mercado initiated the traffic stop on Appellant's vehicle based upon an anonymous tip. In addition, Appellant claims that "Officer Mercado conducted no investigation to corroborate any details from the anonymous tip." *Id.* Appellant therefore argues that "the traffic stop was made without reasonable suspicion," and, as such, "all evidence seized therefrom is subject to suppression." *Id.* at 38.

When reviewing the denial of a motion to suppress, we must consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. *Commonwealth v. Mbewe*, 203 A.3d 983, 986 (Pa. Super. 2019) (citation omitted). We are bound by the suppression court's findings if they are supported by the record. *Id.* "Factual findings wholly lacking in evidence, however, may be rejected." *Commonwealth v. Dangle*, 700 A.2d 538, 540 (Pa. Super. 1997) (citation omitted). We may only reverse the suppression

court if the legal conclusions drawn from the findings are in error. ***Commonwealth v. Foglia***, 979 A.2d 357, 360 (Pa. Super. 2009) (citation omitted).

Importantly,

> [O]ur scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing. ***See In re L.J.***, 79 A.3d 1073, 1087 (Pa. 2013).

> Further, Pa.R.Crim.P. 581 provides that "[t]he Commonwealth shall have the burden ... of establishing that the challenged evidence was not obtained in violation of the defendant's rights." Pa.R.Crim.P. 581(H). Specifically, the Commonwealth has the burden of "establish[ing] by a preponderance of the evidence that the evidence was properly obtained." ***Commonwealth v. Galendez***, 27 A.3d 1042, 1046 (Pa. Super. 2011) (citation omitted).

***Commonwealth v. Barnes***, 296 A.3d 52, 55 (Pa. Super. 2023) (parallel citations and quotation omitted).

Under Pennsylvania law, there are three categories of police citizen interactions. As our Supreme Court has clearly articulated:

> The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

***Commonwealth v. Gutierrez***, 36 A.3d 1104, 1107 (Pa. Super. 2012) (quotation omitted), *appeal denied*, 48 A.3d 1247 (Pa. 2012).

This Court previously explained:

A police officer may detain an individual in order to conduct an investigation if that officer reasonably suspects that the individual is engaging in criminal conduct. "This standard, less stringent than probable cause, is commonly known as reasonable suspicion." In order to determine whether the police officer had reasonable suspicion, the totality of the circumstances must be considered. In making this determination, we must give "due weight ... to the specific reasonable inferences [the police officer] is entitled to draw from the facts in light of his experience." Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, "[e]ven a combination of innocent facts, when taken together, may warrant further investigation by the police officer."

*Commonwealth v. Raglin*, 178 A.3d 868, 872 (Pa. Super. 2018) (internal citations and quotation omitted).

Further:

"To have reasonable suspicion, police officers need not personally observe the illegal or suspicious conduct, but may rely upon the information of third parties, including 'tips' from citizens." *Commonwealth v. Lohr*, 715 A.2d 459, 461 (Pa. Super. 1998) (quotation omitted). "Naturally, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." [*Commonwealth v.*] *Wiley*, 858 A.2d [1191,] 1194 [(Pa. Super. 2004)] (quotation and quotation marks omitted). This Court has examined the requirements surrounding reasonable suspicion for automobile stops emanating from information provided by a tipster and has explained:

Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the "totality of the circumstances—the whole picture," that must be taken into

- 13 -

account when evaluating whether there is reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were reliable.

When the underlying source of the officer's information is an anonymous call, the tip should be treated with particular suspicion. However, a tip from an informer known to the police may carry enough *indicia* or reliability for the police to conduct an investigatory stop, even though the same tip from an anonymous informant would likely not have done so.

*Lohr*, 715 A.2d at 461–462 (quotation and citations omitted). Indeed, identified citizens who report their observations of criminal activity to police are assumed to be trustworthy, in the absence of special circumstances, since a known informant places himself at risk of prosecution for filing a false claim if the tip is untrue, whereas an unknown informant faces no such risk. *Commonwealth v. George*, 878 A.2d 881 (Pa. Super. 2005); *Lohr*, *supra*.

*Commonwealth v. Barber*, 889 A.2d 587, 593 (Pa. Super. 2005).

An anonymous tip, on the other hand, requires "[s]ome additional corroboration of [a suspect's] involvement in criminal activity . . . before a *Terry*[7] stop may be undertaken." *Commonwealth v. Hayward*, 756 A.2d 23, 32 (Pa. Super. 2000). Nonetheless, "when an anonymous tip predicts a person's future actions ordinarily not easily predicted, so as to demonstrate 'inside information—a specific familiarity with [the person's] affairs[,]' police corroboration of the prediction itself can support a finding of reasonable suspicion." *Commonwealth v. Fell*, 901 A.2d 542, 545 (Pa. Super. 2006) (citation omitted).

_____

[7] *Terry v. Ohio*, 392 U.S. 1 (1968).

- 14 -

In this matter, it is undisputed that the traffic stop at issue constituted an investigatory detention. Instead, Appellant takes issue with the trial court's determination that the initial stop of his vehicle was supported by reasonable suspicion.

We begin our analysis with a review of the evidence proffered by the Commonwealth during the suppression hearing. At the outset, we recognize that the Commonwealth relied solely upon the testimony of Officer Mercado and Officer Shaheen[8] to oppose Appellant's suppression motion. In particular, Officer Mercado, a Senior Patrolman in the Blakely Borough Police Department, provided the following testimony. Officer Mercado stated that, on July 3, 2020, he received a dispatch from then "911 Comm[unication] Center]" indicating that an incident occurred in Dickson City involving an individual, described as "either a Hispanic male or a Mexican male," who "brandished a firearm inside of a vehicle." N.T. Suppression Hearing, 12/11/20, at 7-8. In addition, Officer Mercado testified that the dispatch provided the vehicle's license plate number, described the vehicle as a "beige/gold GMC Acadia," "stated that the male left the scene in Area 23, in Dickson City, had started making his way toward [Blakely,]" and "was heading towards . . . the Dunkin Donuts." *Id*. at 8-9. Officer Mercado explained that, in response to the aforementioned dispatch, he "started making [his] way" to

---

[8] Officer Shaheen, also a Senior Patrolman of the Blakley Borough Police Department, only testified regarding the events that occurred after the initial stop of Appellant's vehicle, including the search of the vehicle.

the "Dunkin Donuts area" of Blakely "to try and intercept the vehicle." *Id.* at 9.  At that time,[9] Officer Mercado spotted the GMC Acadia right in front of him. *Id.*  As such, Officer Mercado activated his lights and sirens and stopped the vehicle "on Main and Mary Street in Dickson City." *Id.* at 10.  Importantly, both Officer Mercado and Officer Shaheen admitted on cross-examination that neither of them knew the identity of the individual who reported the incident. *See id.* at 13 and 19.  Officer Shaheen, however, stated that, after Appellant's arrest, another officer contacted the 911 Communication Center and "went and got a written statement from the witness." *Id.* at 19.

A review of the foregoing reveals two errors committed by the trial court.  First, Officer Karabin and Officer Camillocci testified at trial but did not testify during Appellant's suppression hearing.  Instead, the Commonwealth relied solely upon Officer Mercado's testimony to explain the circumstances of Appellant's initial seizure.  Second, the Commonwealth did not introduce any testimony or evidence regarding the apparent witness in this matter,  Luke A. Mushensky, Jr.  The Commonwealth did not introduce the audio recording of the 911 call, a transcription of the 911 call, a report of the 911 call, or the testimony of the dispatcher.  In addition, Officers Mercado and Shaheen did not provide any information regarding the source of the dispatcher's knowledge.  Based upon the foregoing, we reject the trial court's conclusion

---

[9] In particular, Officer Mercado later testified that he received the information from dispatch as the GMC Acadia "was turning out in front of [him]."  N.T. Suppression Hearing, 12/11/20, at 12.

that Luke Mushensky, Jr. constituted an "identified witness" and, instead, conclude that the tipster here were anonymous. *See Dangle*, 700 A.2d at 540 (explaining that "[f]actual findings wholly lacking in evidence . . . may be rejected.") (citation omitted). We must therefore consider whether, even if the initial tip was anonymous, Officer Mercado possessed "[s]ome additional corroboration of [Appellant's] involvement in criminal activity" and, as such, reasonable suspicion, thereby justifying Appellant's initial seizure. *Hayward*, 756 A.2d at 32.

Upon review, we conclude that, based upon the totality of circumstances, the initial stop of Appellant's vehicle was supported by reasonable suspicion. First, we note that the anonymous tip contained a high degree of specificity. The report included a description of the suspect as a Hispanic or Mexican male, indicated that he drove a beige/gold GMC Acadia, and provided the vehicle's license's plate number. The report also relayed the direction in which the GMC Acadia traveled, noting that it was headed toward the Dunkin Donuts in Blakely. Importantly, Officer Mercado testified that he located the GMC Acadia, with the same license's plate number, heading in the predicted direction, while he received the dispatch. We therefore conclude that, given the specificity of the tip as well as Officer Mercado's simultaneous observation of the vehicle and driver described, the traffic stop in question was supported by reasonable suspicion. *Compare Commonwealth v. Swartz*, 787 A.2d 1021, 1025 (Pa. Super. 2001) (holding that the "absence of certain information coupled with the duration of time which passed between

the informant's call and the trooper's [vehicle] stop [prevented a finding that] the trooper possess[ed] reasonable suspicion that [the] vehicle was being operated by someone under the influence"). Because Officer Mercado's personal observations corroborated several predictive features of the anonymous tip, we conclude that the Commonwealth demonstrated reasonable suspicion to support the challenged stop. Accordingly, we affirm the trial court's order denying Appellant's motion to suppress.

In his fourth issue, Appellant contends that the Commonwealth presented insufficient evidence to sustain his conviction under 18 Pa.C.S.A. § 6105. Appellant's main contention revolves around his belief that the Commonwealth failed to prove that he was previously convicted of a felony, namely, PWID 35 Pa.C.S.A. § 780-113(a)(30).

Our standard of review for a sufficiency challenge is well settled.

> As a general matter, our standard of review of sufficiency claims requires that we evaluate the record "in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence." **Commonwealth v. Widmer**, 744 A.2d 745, 751 (Pa. 2000). "Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt." **Commonwealth v. Brewer**, 876 A.2d 1029, 1032 (Pa. Super. 2005). Nevertheless, "the Commonwealth need not establish guilt to a mathematical certainty." **Id.**; **see also Commonwealth v. Aguado**, 760 A.2d 1181, 1185 (Pa. Super. 2000) ("[T]he facts and circumstances established by the Commonwealth need not be absolutely incompatible with the defendant's innocence"). Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances. **See**

> ***Commonwealth v. DiStefano***, 782 A.2d 574, 582 (Pa. Super. 2001).
>
> The Commonwealth may sustain its burden by means of wholly circumstantial evidence. ***See Brewer***, 876 A.2d at 1032. Accordingly, "[t]he fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence." ***Id.*** (*quoting* ***Commonwealth v. Murphy***, 795 A.2d 1025, 1038–1039 (Pa. Super. 2002)). Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld. ***See Brewer***, 876 A.2d at 1032.

***Commonwealth v. Rahman***, 75 A.3d 497, 500-501 (Pa. Super. 2013)

(parallel citations and quotation omitted).

This Court previously explained:

> The Crimes Code prohibits a person who has been convicted, in this Commonwealth or elsewhere, of a[n enumerated offense] from having a firearm in his possession or under his control. 18 Pa.C.S. § 6105. The Commonwealth must present evidence of a prior conviction of a crime of violence in order to sustain a conviction under Section 6105. ***Commonwealth v. Payne***, 463 A.2d 451, 456 (Pa. Super. 1983).

***Commonwealth v. Jones***, 172 A.3d 1139, 1143 (Pa. Super. 2017) (parallel

citations omitted).

The trial court described the evidence submitted by the Commonwealth

in this instance as follows:

> In the instant case, the Commonwealth alleged that Appellant had previously entered a guilty plea to a charge of Manufacture, Delivery, or Possession of a Controlled Substance With Intent to Deliver in Pennsylvania - 35 Pa.C.S.A. § 780-113(a)(30).

Under Section 6105, [a conviction for violating 35 Pa.C.S.A. § 78—113(a)(30)] precludes the possession, use or control of a firearm. 18 Pa.C.S. § 6105(b).

In support of its claim that Appellant had a felony drug conviction, the Commonwealth presented the testimony of Mauri Kelly, Lackawanna County Clerk of Judicial Records. Ms. Kelly explained that she was an elected official who served as custodian of the criminal records in Lackawanna County. Based on the documents reviewed, she testified to [] Appellant's prior felony conviction. [*See*] N.T. Trial, 4/20/21, [at 13-15 (explaining that a review of the criminal record for "Victor Nieves-Crespo" revealed that he entered a guilty plea on July 7, 2011 to "manufacture, delivery, possession with intent to manufacture deliver" which is graded as "[a] felony")]. In further support, the Commonwealth submitted [] Appellant's criminal record with the matching name[,] Victor Nieves[-]Crespo, [date of birth, July 4, 1987,] and [a matching Social Security Number].

Trial Court Opinion, 11/27/23, at 12-13.

Our review of the evidence confirms that, reviewing all of the evidence presented and drawing all reasonable conclusions therefrom, the Commonwealth presented sufficient evidence to prove that Appellant's prior drug conviction rendered him legally ineligible from possessing, using or controlling a firearm pursuant to Section 6105. Accordingly, Appellant's claim fails.

In his final issue, Appellant contends that 18 Pa.C.S.A. §§ 6105(a)(1) and 6106 are unconstitutional.[10] More specifically, Appellant contends that

_____

[10] Appellant did not challenge the constitutionality of Sections 6105 and 6106 until he filed his post-sentence motion on June 22, 2023. In contrast to the Commonwealth's claims, by raising his claim in his post-sentence motion, Appellant sufficiently preserved his constitutional challenge for our review. *(Footnote Continued Next Page)*

both Section 6105 and 6016 violate his rights under the Second Amendment[11]

and Fourteenth Amendments of the United States' Constitution, as well as

Article I, Section 21 of the Pennsylvania Constitution[12] in light of **New York**

**State Rifle & Pistol Association, Inc. v. Bruen**, 597 U.S. 1 (2022).

This Court previously explained:

> A challenge to the constitutionality of a criminal statute
> presents us with "a pure question of law for which our standard

_____

**See Commonwealth v. McIntyre**, 2024 WL 1245688 *1, *5 (Pa. Super. March 25, 2024) (addressing the appellant's constitutional challenge even though it was first raised in his supplemental post-sentence motion).

[11] The Second Amendment reads as follows:

**Right To Bear Arms**

A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. CONST. AMEND. II.

[12] The portions of the Pennsylvania Constitution that Appellant relies upon are as follows:

**Inherent rights of mankind**

All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

PA. CONST. Art. 1, § 1.

**Right to bear arms**

The right of the citizens to bear arms in defence of themselves and the State shall not be questioned.

PA. CONST. Art. 1, § 21.

of review is *de novo*, and our scope of review is plenary." ***Commonwealth v. Collins***, 286 A.3d 767, 775 (Pa. Super. 2022). Our review is guided by the following:

> [A] statute is presumed to be constitutional and will only be invalidated as unconstitutional if it clearly, palpably, and plainly violates constitutional rights.
>
> [A] defendant may contest the constitutionality of a statute on its face or as-applied. A facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case. An as-applied attack, in contrast, does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right. A criminal defendant may seek to vacate his conviction by demonstrating a law's facial or as-applied unconstitutionality.

> ***Commonwealth v. Bradley***, 232 A.3d 747, 756-757 (Pa. Super. 2020) (citation omitted [and] paragraph break added). "If there is any doubt that a challenger has failed to [demonstrate the] high burden [of establishing the unconstitutionality of a statute], then that doubt must be resolved in favor of finding the statute constitutional." ***Collins***, 286 A.3d at 785 (citation omitted).

***Commonwealth v. Papp***, 305 A.3d 62, 70–71 (Pa. Super. 2023), *appeal denied*, 2024 WL 1400084 (Pa. Apr. 2, 2024).

As Appellant bases his constitutional challenge to Section 6105 and 6106 on ***Bruen***, we begin our analysis of Appellant's claim with a review of that decision. In ***Bruen***, the United States Supreme Court addressed the constitutionality of a New York statute which required proper cause, or a special need for self-protection, to obtain a license to carry a handgun outside the home. ***Bruen***, 597 U.S. at 12-13. In reaching this conclusion, the High Court initially rejected the "means-ends" approach developed by the courts of

appeals subsequent to its decisions in *Heller v. District of Columbia*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010) which held that "the Second and Fourteenth Amendments protect an individual's right to keep and bear arms for self-defense." *Id.* at 17. Instead, the Court clarified that, when asked to determine whether firearms regulations pass constitutional muster, a court must first address whether the individual is "part of 'the people'" whom the Second Amendment protects." *Id.* at 31-32, *citing Heller*, 554 U.S. at 580. Then, a court must "turn to whether the plain text of the Second Amendment protects [that individual's] proposed course of conduct" so that the Constitution presumptively protects it. *Id.* at 32. If so, the court must then determine whether the government, in justifying its regulation, demonstrates "that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17. "Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.*

The High Court then turn to the facts in *Bruen*. First, it determined that, because the petitioners in *Bruen* were "two ordinary, law-abiding, adult citizens" it was "undisputed" that they were "part of 'the people' whom the Second Amendment protects." *Id.* at 32 (citation omitted). Second, it held, with "little difficulty," that the petitioner's proposed conduct, *i.e.*, "carrying handguns publicly for self-defense," was protected by the "plain text of the Second Amendment." *Id.* Finally, it determined, after a thorough review of

the historical evidence submitted, that the government failed to meet "their burden to identify an American tradition justifying [the New York statute's] proper-cause requirement." *Id.* at 70. The Court therefore concluded that "New York's proper-cause requirement violat[ed] the [Second and] Fourteenth Amendment[s] in that it prevented law-abiding citizens with ordinary self-defense needs from exercising their right to bear arms." *Id.* at 71.

Importantly, in his concurring opinion, Justice Kavanaugh undertook to clarify the majority opinion. In so doing, Justice Kavanaugh initially noted that the "Court employ[ed] and elaborate[ed] on the text, history, and tradition test that *Heller* and *McDonald* required for evaluating whether a government regulation infringes on the Second Amendment right to possess and carry guns for self-defense." *Id.* at 79 (Kavanaugh, J., concurring, joined by Roberts, C.J.). Justice Kavanaugh then went on to "underscore two important points about the limits of the Court's decision." *Id.* He stated,

> *First*, the Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense. In particular, the Court's decision does not affect the existing licensing regimes–known as 'shall-issue' regimes– that are employed in 43 States[, including Pennsylvania].
>
> [Instead, t]he Court's decision addresses only the unusually discretionary licensing requirements, known as 'may-issue' regimes, that are employed by [six] States, including New York.
>
> ***
>
> *Second*, as *Heller* and *McDonald* established and the Court today again explains, the Second Amendment "is neither a regulatory straightjacket nor a regulatory blank check." Properly interpreted, the Second Amendment allows a "variety" of gun regulations. *Heller*, 554 U.S. at 636[.] As Justice Scalia

wrote in his opinion for the Court in **Heller**, and Justice [Alito] reiterated in relevant part in the principal opinion in **McDonald**:

"Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. … [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. [Footnote 26: We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive.]

"We also recognize another important limitation on the right to keep and carry arms. [**U.S. v. Miller**, 307 U.S. 174 (1939)] said, as we have explained, that the sorts of weapons protected were those in common use at the time. We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons." **Heller**, 554 U.S. at 626−627, and n. 26, (citations and quotation marks omitted); **see also McDonald**, 561 U.S. at 786 (plurality opinion).

**Id**. at 79-81 (parallel citations omitted) (emphasis in original).

We first address Appellant's challenge to Section 6105's constitutionality. To do so, we begin our analysis of Appellant's constitutional challenge with the threshold question posed by **Bruen**: whether Appellant is one of "the people" who have Second Amendment rights. Appellant offers no argument addressing this point.

Importantly, the question of whether a convicted felon is one of "the people" included within the protective sweep of the Second Amendment was recently addressed by a panel of this Court. **See McIntyre**, **supra**. Indeed,

*McIntyre* considered whether the appellant, who was previously convicted of, *inter alia*, burglary, robbery, and aggravated assault and, as such, statutorily prohibited from possessing a firearm under Section 6105, was one of "'the people' who [had] a right to possess arms under the Second Amendment." *Id.* at *8. In considering this claim, the *McIntyre* Court noted that, in outlining the contours of its decision, *Bruen* relied on *Heller*, which "specifically validated the prohibition on the possession of firearms by felons as being consistent with the individual rights protected by the Second Amendment." *Id.* Thus, this Court ultimately held that "*Bruen* [did] not stand for the principle that convicted violent offenders . . . are 'the people' who have a right to possess arms under the Second Amendment.'" *Id.* The *McIntyre* Court explicitly concluded that such individuals were beyond "the reach of *Bruen*." *Id.*, *citing* *United States v. Coleman*, 2023 WL 122401 *1,*2 (N.D. W.Va. 2023) (concluding that "the reach of *Bruen* ends at the feet of those individuals who are not law-abiding citizens").

Upon review, we conclude that, pursuant to *McIntyre*, Appellant, as a convicted felon, is not one of "the people" whose firearms rights are protected by the Second Amendment. As stated in *McIntyre*, *Bruen* is inapplicable to individuals with prior felony convictions. This determination is consistent with the contours of *Bruen*, as explained by Justice Kavanaugh, as well as four other justices in their various concurring/dissenting opinions. *See Bruen*, at 72 (Alito, J., concurring) (noting that the decision does not "disturb[] anything that [the Court] said in *Heller* or *McDonald*[,] . . . about restrictions that

may be imposed on the carrying of guns"); *see also id.* at 80-81 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (emphasizing that "the Second Amendment allows a 'variety' of gun regulations," and that ***Bruen*** did not "cast doubt on longstanding prohibitions on the possession of firearms by felons" (citation omitted)); *id.* at 129-130 (Breyer, J., dissenting, joined by Sotomayor, and Kagan, JJ.) (explaining that "[l]ike Justice [Kavanaugh], I understand the Court's opinion today to cast no doubt on th[e] aspect of ***Heller's*** holding" that addressed presumptively lawful firearm restrictions, including the prohibition of the possession of a firearm by a felon).  As such, Appellant's claim that Section 6105 violates his Second Amendment rights fails.

In this same vein, we conclude that ***Bruen*** is inapplicable to Section 6106 and, as such, Appellant's constitutional challenge fails.  As explained above, ***Bruen*** addressed the constitutionality of a New York statute which demanded that, prior to obtaining a license to carry a handgun in public for self-defense, a citizen was required to demonstrate "proper cause," *i.e.*, "a special need for firearm protection distinguishable from that of the general community." ***Bruen***, 597 U.S. at 12.  Ultimately, the ***Bruen*** Court held that this "'may-issue' licensing regime for carrying handguns for self-defense violate[d] the Second Amendment."  ***Id***. at 79 (Kavanaugh, J., concurring, joined by Roberts, C.J.).

In contrast, Section 6106 states, in relevant part,

> Upon the receipt of an application for a license to carry a firearm, the sheriff **shall**, with 45 days, issue or refuse to issue a license on the basis of the investigation under subsection (d) and the accuracy of the information contained in the application.

18 Pa.C.S.A. § 6109(g) (emphasis added).  Thus, unlike New York's statute, and as recognized in *Bruen*, Pennsylvania is one of the "43 States" that "employ[s an] objective shall-issue licensing regime," *i.e.*, a jurisdiction "where authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability." *Id*. at 13, and 80 (Kavanaugh, J., concurring, joined by Roberts, C.J.); *see also id*. 13, n.1 (listing states).  Importantly, *Bruen* explicitly stated that "shall-issue licensing regimes are constitutionally permissible" and, as such, those "43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so."  *Id*. at 80 (Kavanaugh, J., concurring, joined by Roberts, C.J.).  Hence, Appellant's claim that Section 6106 violates his Second Amendment rights pursuant to *Bruen* lacks merit. *See Commonwealth v. Gutierrez-Santana*, 2024 WL 394644, at *4 (Pa. Super. Feb. 2, 2024) (non-precedential decision) (holding that the appellant's claim that Section 6106 violated his Second and Fourteenth Amendment rights "in accordance with *Bruen*" was "without merit" because "*Bruen* [was] inapplicable").

We now turn to Appellant's claim that Section 6105 and 6106 violate Article 1, Section 21 of the Pennsylvania Constitution.  Appellant herein urges

this Court to engage in analysis pursuant to **Commonwealth v. Edmunds**, 586 A.2d 887, 895 (Pa. 1991) and determine that the "Pennsylvania Constitution provides greater protection than the Second Amendment." Appellant's Brief at 49. We decline to do so for three reasons. First, firearms regulations, like Sections 6105 and 6106, retain constitutional validity under **Bruen** and Appellant offers no evidence or authority to undermine that conclusion. Second, a previous panel of this Court expressly found that Section 6106 did not violate Article I, Section 21. **See Commonwealth v. McKown**, 79 A.3d 678, 691 (Pa. Super. 2013). Third, a review of case law promulgated throughout the Commonwealth reveals that, when confronted with a claim that a statute is violative of both the Second Amendment of the United States Constitution and Article I, Section 21 of Pennsylvania's Constitution, Pennsylvania courts engage in a singular analysis, suggesting that both provisions offer the same protection.[13] **See id.** at 691 (analyzing the appellant's challenge to 18 Pa.C.S.A. § 6106 under Article I, Section 21 pursuant to the same framework as that of the Second Amendment); **see also Caba v. Weaknecht**, 64 A.3d 39, 53 (Pa. Commw. 2013); **Perry v. State Civ. Serv. Comm'n (Dep't of Lab. & Indus.)**, 38 A.3d 942, 954-955

[13] Our Supreme Court recently observed that "[o]nly on rare occasions have the courts of Pennsylvania construed the [state] constitutional provision providing for the right to bear arms." **Barris v. Stroud Township**, 310 A.3d 175, 180 n.4 (Pa. 2024) (quotation omitted). The Court then cited to the "two decisions" which it "seriously entertained the provision at all." **Id.**, *citing* **Ortiz v. Commonwealth**, 681 A.2d 153 (Pa. 1996); **Wright v. Commonwealth**, 1875 WL 13027 (Pa. 1875). Neither cases discussed whether Article I, Section 21 provided greater protection than that of the Second Amendment.

(Pa. Commw. 2011). We therefore decline to hold that Article I, Section 21 of the Pennsylvania Constitution offers heightened protection to one's right to bear arms.

Based upon all of the foregoing, we conclude that Appellant's claim that Sections 6105 and 6106 violate his constitutional rights, both federal and state, fails.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 05/17/2024